## JOHNSON v. THE STATE.

1. The verdict was amply supported by the evidence.
2. Where nothing in the record indicates that any improper circumstance was injected into the case, and the charge of the court fully and accurately instructed the jury on the issues involved, a new trial will not be granted because of the refusal of the court to give a cautionary request, calling the attention of the jury to the heinousness of the charge against the defendant and the difficulty, growing out of the nature of the usual circumstances of the crime, in defending against the accusation of rape.
3. The alleged newly-discovered evidence was not of such a character as requires the grant of a new trial.

COBB, P. J., and ATKINSON, J., dissenting. While applications for new trial upon the ground of newly-discovered evidence are not favored, and the trial judge has a very wide discretion in passing upon such applications, still when, in a case where the accused is under sentence of death, the newly-discovered evidence of a witness, properly vouched for as to character and credibility, is such that if credited by a jury it would raise grave doubts as to the guilt of the accused, even if it would not establish his innocence, a judgment refusing to grant a new trial should be reversed by the Supreme Court, in order that another jury may pass upon such evidence in connection with the evidence adduced at the trial. The fact that the statement of the accused and the testimony of a witness introduced in his behalf were not consistent with the testimony of the newly-discovered witness should not alter this rule.

Argued March 18,—Decided April 11, 1907.

Indictment for rape. Before Judge Roan. Fulton superior court. January 26, 1907.

The defendant was convicted of rape, and moved for a new trial, which was refused, and he complains in his bill of exceptions that the court erred in overruling his motion for a new trial. On the trial Mrs. Hembree testified, that on the morning of August 15, 1906, between six and seven o'clock, the defendant met her on the road, about a quarter of a mile from her residence, and asked her to give him her pocket-book, which she did at once. He took the money out of it and threw the pocket-book away. He then grabbed her, choked her, and dragged her about thirty feet from the roadside and ravished her. She immediately went home, arriving there about seven o'clock, and told her husband and others of the assault upon her. She described her assailant, immediately after the occurrence, as a tall, slender, black negro, wearing a mustache, and clad in blue overalls, black coat, and an old black

slouch hat.  She positively identified the defendant as her assailant, and testified that she had refused to identify as many as twenty others who had been brought before her for identification. Other witnesses testified that the defendant resided at number 16 Chestnut street, from one and a half to two and a half miles from the scene of the assault.  The road from the defendant's residence to the place of the assault passes Battle Hill, which is about three quarters of a mile distant from Mrs. Hembree's home.  A witness testified that on the morning of the assault, between six and seven o'clock, he saw on the road near Battle Hill a man answering the description, both as to size and dress, given by Mrs. Hembree of her assailant, walking hurriedly in the direction of the Hembree home.  This witness testified he had never seen the man before, but that he was like the defendant, though he could not swear positively as to his identity.  Mrs. Latham, in the rear of whose house the defendant lived, and whom the defendant introduced as his witness, testified that she saw the defendant leave her premises at about ten minutes past six o'clock on the morning of August 15, 1906.  The defendant was arrested on November 16 thereafter, about a mile and a quarter from Battle Hill.  The officer described the manner of his arrest in this way:  "He [the defendant] was coming down the street and I was going out the street, and he dodged right around that blacksmith shop right at the corner.  I was on my horse, and I spurred up my horse, and he started to run, and I holloed to him to stop, and I caught him." On the trial the defendant in his statement denied his guilt, and further stated, that he had been working at the Southern Express Company's stable, and had wrenched his back; that on the day of the alleged assault he was at home, and did not know anything about it until informed that afternoon by Mrs. Latham; that on the morning of the assault he got up and went out to the closet, and as he came back to his house he saw Mrs. Latham, and then went to the gate of the alley, turned around, and returned to his house, where he remained all day until that afternoon.  He introduced as a witness a woman who testified that she lived in the house with him, and that on the day of the assault the defendant never left the house.  Counsel for the plaintiff in error, in the argument, admitted that the evidence established that a rape had been committed upon the person of Mrs. Hembree, but contended that

the evidence was insufficient to show beyond a reasonable doubt that the defendant was the guilty person, and that a new trial should have been granted for this reason, as well as because of the refusal of the court to give in charge a certain instruction requested in writing, and because of newly-discovered evidence.

*Walter McElreath* and *Alexander W. Stephens,* for plaintiff in error.

*John C. Hart, attorney-general,* and *C. D. Hill, solicitor-general,* contra.

EVANS, J. 1. The record contains evidence abundantly corroborative of Mrs. Hembreé that she was the victim of a rapist. We think the brief narrative of the facts developed on the trial, as contained in the foregoing summary of the evidence, was sufficient to support the finding of the jury that the defendant was the guilty person. There was evidence tending to discredit his alibi, and we will not interfere with a verdict, which has the approval of the trial judge, and which is sustained by the evidence, establishing not only that a rape was committed, but also that the defendant is the guilty person.

2. The court refused to give the following instruction, requested in writing by the defendant's counsel: "The charge made against the defendant in this case is in its nature a most heinous one, and well calculated to create a strong prejudice against the accused, and the attention of the jury is directed to the difficulty growing out of the nature of the usual circumstances of the crime in defending against the accusation of rape. So you, the jury, must carefully consider all the evidence in the case and the law given you by the court in making your verdict." This court has several times held that it is not ground for a new trial to give the jury a cautionary charge couched in appropriate language. *McTyier* v. *State,* 91 *Ga.* 254; *Beck* v. *State,* 76 *Ga.* 452. Though it may be proper to give a cautionary instruction in an appropriate case, the judge is not bound to do so. In every criminal case the judge is bound to give in charge to the jury the principles of law which of necessity must be applied by them in reaching a correct conclusion upon the questions submitted for their consideration. A prophylactic instruction has no tendency to elucidate the issue; it only sounds a note of warning that the jury must not be influenced in their deliberations because of the character of the particular crime, or

the bias of popular opinion, or because of other foreign and extraneous matters. The charge given by the learned judge in this case was full and impartial, and was expressed in language to which no exception is taken by counsel for the accused.

3. A new trial is asked because of newly-discovered evidence tending to establish a different alibi than that relied on at the trial. The newly-discovered evidence consists, in part, of a time book containing a list of the laborers and their time, kept by H. I. McDuffie, the foreman of the Southern Concrete Company, in the construction of a stable for the Southern Express Company at Mangum street, in the city of Atlanta, for the week embracing August 15; the entry in the book being that among the thirteen laborers who worked on the stables on Wednesday, August 15, the defendant worked nine and one half hours. Other newly-discovered evidence is the testimony of McDuffie, who deposed, that he knew the defendant, and that the defendant is the Will Johnson whose name appears on the book; that deponent kept the time book in the capacity of foreman of the Southern Ferro-Concrete Company, and it related to the laborers employed and the time they worked in the construction of the Southern Express Company's stables, on the corner of Mangum and Chapel streets, in the city of Atlanta; that the entries were made by him at the time the work was being performed, and showed the number of hours worked by each laborer, and deponent believes the entries to be correct, as he was in the habit of making correct entries; that during the month of August a full day's time upon that job of work consisted of ten hours a day, except Saturday, the work day beginning at 6:30 a. m. and ending at 5 p. m., with half an hour out for dinner. The deponent further deposed that he was a resident of Fayetteville, N. C., but at the time of making the affidavit he was located in Birmingham, Ala., in the employment of the Southern Ferro-Concrete Company, and expected to remain there for at least six months, but should it be necessary for him to attend a trial of the defendant he was willing to do so, and so far as he knew he would be able to do so. The evidence of R. B. Haywood is also claimed to be newly-discovered evidence. He deposed, by affidavit, that during the month of August, 1906, he was employed by the Southern Ferro-Concrete Company in building the stables of the Southern Express Company, and was sub-foreman under H. I. McDuffie,

who was foreman; that it was McDuffie's duty to superintend the laborers, see that they worked, and ascertain the number of hours worked by each laborer daily, by walking over the job and calling the roll, and checking each man to ascertain the time worked by each laborer, and then and there to make daily entries in the time book of the number of hours worked for such day by each laborer; that McDuffie performed these duties during August, 1906; that the entries in the time book are in McDuffie's handwriting; that the book indicates that the defendant worked under McDuffie on the Southern Express Company's stables nine and one-half hours on Wednesday, August 15, 1906; that McDuffie was in . the habit of keeping correct time and making correct entries in the time book; that Will Johnson worked on this job under McDuffie; that the stables are two and one half miles from Battle Hill, which distance could not be made in less time than forty minutes by a man in an ordinary walk. Deponent resides in Atlanta. Affidavits were exhibited to support the credit of McDuffie and Haywood.

The defendant, Will Johnson, deposed by affidavit that he did not know of this evidence and could not have discovered it by the exercise of ordinary diligence. He further deposed as follows: "That being innocent of the crime with which he is charged, he had no personal knowledge of the date upon which or the time at which the crime with which he is charged was actually committed; that after his indictment he endeavored to refresh his recollection as to the 15th day of August, 1906, but on account of the lapse of time he had become confused and uncertain as to dates that long past, and he was unable to remember anything about that particular date or fix certainly in his mind his whereabouts on said particular date, nor did he have any means of refreshing himself about said particular date; that his only knowledge of the time of the commission of the crime with which he is charged was his recollection of the time and circumstances under which he first heard of said crime; that he knew and was able to recall that he was at home sick on a certain day about the middle of August, and he remembered that on said day on which he was at home sick he then first heard of the assault on Mrs. Hembree, and he thought the crime had been committed on the date that he had heard of it, but he was unable to remember what day of the month he was at

home sick and on which he heard of said assault. Being unable to recall, by reference to date, the 15th day of August, 1906, he did not know whether he had worked on said date or not, and accordingly he informed his counsel that he was at home sick on the date on which Mrs. Hembree was assaulted, believing the date of the said assault to be identical with the date of his being at home sick. He did inform his counsel that at some time in August, the exact dates of which he could not recall, he worked for the concrete company on its stables, but he worked there only a few days, and he did not know the name or address of the foreman or the names and addresses of any of the men with whom he worked; he did not know that Henry I. McDuffie Jr. would testify that he worked on said date until since his conviction, and he did not know of the existence of any time book showing that he worked on said date until after his conviction; he did not withold anything touching his whereabouts on said date from his counsel, or any other matter touching his defense, but told all that he could, as best he could remember it." Counsel for defendant deposed, by affidavit, that immediately after their appointment by the court to defend Will Johnson, they held an interview with him and inquired of his whereabouts from April, 1906, to the time of his arrest, informing the defendant that the indictment charged him with the crime of rape committed on August 15, 1906; that defendant gave them a number of places where he had worked during this period, including the express company's stables on Mangum street. Deponents applied to the office of the Southern Ferro-Concrete Company and asked the officers and clerks there employed for information as to whether there was any witness who could testify that the defendant worked on August 15, 1906, or whether they had any pay-roll, time book, or other memoranda, which would show whether or not he worked for the company on that day. Deponents could find neither witness nor memoranda showing whether or not defendant worked for the company on that date. Deponents were led by defendant and his witnesses, Emma Glover and Mrs. Latham, to believe that defendant had not worked that day, but was at his home, and had no reason to believe that there was in existence any evidence that defendant was at work on that date. After the trial they received of Mr. Duncan, a clerk of the Southern Ferro-Concrete Company, a time book which had been

discovered in Mobile, Alabama, in the possession of the wife of H. I. McDuffie, which is the book attached to the motion.

Newly-discovered evidence is not favored as a ground for granting a new trial. When a new trial is asked for on this ground it is incumbent on the movant to satisfy the court that the evidence has come to his knowledge since the trial; that it was owing to no want of diligence that it did not come sooner; that it is so material that it would probably produce a different verdict if the new trial be granted; that it is not cumulative, and is not of an impeaching character. *Berry* v. *State,* 10 *Ga.* 512; Civil Code, §§ 5480-1. Courts are not obliged to grant new trials on the ground of newly-discovered evidence, unless they are reasonably convinced that on another trial there would probably be a different verdict. *Young* v. *State,* 56 *Ga.* 403. Where the defendant has been given a fair trial and the verdict is supported by the evidence, it should not lightly be set aside and a new trial ordered because of facts subsequently discovered which might possibly produce a different result. The reviewing court should give to the consideration of the evidence alleged to have been newly discovered the most careful scrutiny, and, even if the utmost diligence has been shown, a new trial should not be granted on this ground unless the newly-discovered evidence raises a strong presumption that a different result would probably be reached upon a second trial. In some jurisdictions, where the defendant is permitted to testify in his own behalf, it has been held that a new trial should not be granted where the newly-discovered evidence is inconsistent with the testimony of the defendant on the former trial. People *v.* Hovey, 1. N. Y. Cr. R. 324; People *v.* McCauley, 45 Cal. 146. A new trial will not usually be granted where the newly-discovered evidence supports a defense which is entirely different from or inconsistent with that interposed at the trial. 12 Cyc. 735. It has been held that a new trial will not be granted upon newly-discovered evidence tending to establish the defendant's insanity, where he set up a different defense on the trial. Cooper *v.* State, 120 Ind. 377; People *v.* Freeman, 28 Pac. Rep. 261. It is a sound rule which prohibits a defendant from carving his defense into piecemeal and bringing in new defenses after verdict. The losing party, whether the case be civil or criminal, should never be allowed to trifle with the court by withholding one defense and relying upon it as a means of securing a new trial after

an adverse verdict. In such a case, if the facts authorize the conclusion that the defendant knew of the omitted defense, or had information which would lead to the discovery of the facts if the quest for them had been prosecuted with proper diligence, a new trial should never be granted because of such so called newly-discovered evidence.

The defendant was put upon notice that the date of the alleged assault was August 15. This was the date alleged in the indictment and insisted upon by the prosecution on the trial. He offered evidence tending to establish an alibi on that day. There were several facts relied upon, both by him and his witnesses, to fix the date as Wednesday, August 15. After the trial he makes the discovery that he was mistaken as to his whereabouts on August 15, as stated on his trial, and attempts to show that he was in an entirely different place. His counsel show that they made an attempt at the office of the Southern Concrete Company to ascertain at what time he worked for that company during a period embracing the time the assault is alleged to have taken place. No reason is disclosed why the defendant should not have known his fellow laborers, and yet he made no effort to have them subpoenaed. It might be questionable whether he exercised proper diligence; but waiving the question of diligence, is the newly-discovered evidence so convincing or conclusive in its nature, that a different result would probably be had if a new trial is granted? The witness by whom he expects to establish his new alibi relies upon contemporaneous entries in a book made by him, and from which he infers that the defendant was at work at the stables of the Southern Express Company at seven o'clock. He does not remember and does not undertake to swear positively that the defendant was at the stables as early as seven o'clock on the morning of the 15th of August. It is his inference, from entries on the time book, that because of his superintendence of the hands and seeing that they were kept at work, and the work hours at that time were ten, beginning at six-thirty o'clock in the morning and closing at five o'clock in the afternoon, with half an hour intermission for dinner, the defendant began work at seven o'clock. The sub-foreman deposes that the stables were a forty-minutes walk from Battle Hill. The evidence on the trial discloses that Battle Hill was nearly three quarters of a mile from the place of the

assault. The husband of the victim testified that he was at work in a field half a mile from his house when he received information that his wife had been assaulted, and repaired immediately to his house, reaching his home "something near seven o'clock." The evidence shows that the stables were almost in the heart of the populous city of Atlanta. It does not appear whether or not there was any means of rapid transit which might have been accessible to the accused, nor does it appear that the standards of time relied on by the witnesses were the same. Mrs. Hembree was the wife of a farmer, and McDuffie the foreman of a contractor doing work in the city. It may have been that Mrs. Hembree referred to "sun time," and McDuffie to "railroad time." It is a matter of common knowledge that there is a difference between these standards. It is but right and proper to require a defendant who is seeking a new trial on the ground of alibi to establish a defense which is perfect. If it is not, and is only relied upon to cast suspicion upon the State's evidence, it comes within the rule that the evidence is impeaching in its character. To take the defense of alibi out of this rule, the range of evidence in respect to time and place must be such as reasonably to exclude the possibility of the defendant's presence at the scene of the crime at the time of its commission. We do not think that the range of the newly-discovered evidence establishes a complete alibi for the defendant; and when taken in connection with the fact that the alibi set up by the newly-discovered evidence contradicts the alibi relied on by the defendant at the trial, we can not say that the newly-discovered evidence would probably produce a different verdict.

*Judgment affirmed. Fish, C. J., absent. Lumpkin and Beck, JJ., concur. Cobb, P. J., and Atkinson, J., dissent.*

COBB, P. J. I can not concur in a judgment of affirmance in this case. The record discloses the commission of one of the most atrocious crimes known to law. The fact that the crime was committed can not be doubted. The sole question at the trial was as to the identity of the perpetrator. Upon this question the prosecutrix testified that she could identify the accused as her assailant. Upon the question of identity all persons, even the most conscientious and scrupulous individuals, are sometimes mistaken. The accused stated that he was not at the scene of the crime, but was at home, a mile and a half distant, the entire day. The negro

woman with whom he lived testified to the same effect. The testimony of the negro woman was impeached by proof of contradictory statements. The jury was at liberty to disbelieve the accused as well as his witness. If the case stood alone upon the record, as it discloses what occurred at the trial, I would have no difficulty in concurring in the affirmance of the judgment, the credibility of the witnesses and of the accused being in the first instance a matter for determination by the jury, and in the second instance by the trial judge upon the motion for a new trial. I do not think any error of law was committed which required the granting of a new trial, so far as the rulings at the trial which were complained of are concerned. It is that ground of the motion which relates to the newly-discovered evidence which constrains me to decline to concur with a majority of the court in the affirmance of this judgment. The sole question for determination in this case is, was the accused at the place where the crime was committed? If he was, he was the perpetrator. If he was not, he is an innocent man.

According to the testimony the accused left his home a few minutes after six o'clock on the morning that the crime was committed, and the crime was committed one mile and a half from his home, about half past six o'clock. According to the testimony of the newly-discovered witness, the accused went to work at the stables of the express company, in the city of Atlanta, at seven o'clock on that morning. The record does not disclose the exact distance from the scene of the crime to the point at which the accused went to work, according to the testimony of this witness. It is evident from the record, however, that it was not less than one mile and three quarters nor more than two miles and a half. If the witnesses whose testimony refers to matters of time were all referring to standard time, then it is clear, from the record, that if the accused went to work at the express company's stables at seven o'clock he was there within twenty minutes after the crime was committed. If the newly-discovered witness is referring to standard time, as evidently he is, and the prosecutrix was referring to sun time, then the time between the commission of the crime and the time that the accused reached the stables of the express company would be about forty-five minutes. It is more than probable that all of the witnesses were referring to standard time; for, while the prosecutrix did not live in the city of Atlanta, the farm upon

which she and her husband lived was in the immediate suburbs. It is highly improbable that the witnesses were referring to different methods of computing the time of day. The newly-discovered witness swears positively that the accused was one of a number of hands who worked for him. He also swears that it was his duty to keep a record of the time that each one of the hands went to work, and that he did keep such a record, the same being made contemporaneously with the work of the day. The time book of the 15th day of August is produced by him, and it appears therefrom that the accused reported for work at seven o'clock in the morning at the express company's stables. The character of this witness, who is a white man, is vouched for by a number of witnesses, who, from the designation of their occupations and business, are evidently men of standing and integrity in the communities in which they live. There is absolutely nothing to indicate any reason why this witness should commit the offense of perjury, as well as forge an instrument in writing, for the purpose of aiding the accused in his efforts to obtain a new trial. It is possible—but the barest possibility—that the accused might have been the perpetrator of the crime at the time fixed by the prosecutrix, and then have reached the stables of the express company at seven o'clock. It is, however, beyond all human probability, under the circumstances of the case. The accused, by running, or by walking at an extraordinarily fast gait, might have made the distance required; but it is to be kept in mind that the way from the scene of the crime to the place where the witness says he went to work is, for a part of the way, and probably the greater part, through the streets of the city of Atlanta and its suburbs, and a person passing at that hour in the morning at the unusual gait which would have been required would have been more than apt to attract attention of more than one person, even if it is reasonable to presume that a negro, having committed the atrocious crime involved in this case, would rush right into the center of a large and populous city and quietly take up his daily work within less than an hour after the crime was committed. If the testimony of the newly-discovered witness is to be credited, the jury would be authorized, even if not required, under all of the circumstances of the case, to find that the accused was not the perpetrator of the crime. But even if it is not true that such a verdict would be so authorized or re-

quired, such testimony, coming from the mouth of a credible witness, raises the gravest doubts as to the guilt of the accused.

It is said, though, that the accused made a false statement at the trial as to where he was on that day.   Whether this is willfully false or not no one can say.   Arrested three months after the crime was committed, the fact that he may have made a mistake as to the date on which he was at home would not render his mistake different from similar mistakes that would be made by other persons under the same conditions.   But suppose his statement is false, and suppose the testimony of the negro woman who corroborated him is perjured, these facts should not weigh in the balance when grave doubt as to his guilt of the crime charged is brought about by the newly-discovered evidence.   He is not to be punished for the false statement at the trial.   He is not to be punished for subornation of perjury, if he procured the negro woman to testify in his behalf.   He is to be punished for rape, and only after the evidence of his guilt is such as to satisfy the mind of a reasonable man that he is guilty beyond all reasonable doubt.   I do not think that counsel for the accused, who were appointed by the court to perform the duty of seeing that he was tried according to law, have been wanting in diligence.   The record discloses that they were as diligent as possible under all of the circumstances of the case.   Counsel, although appointed by the court, went to work in good faith to see that the accused had a trial according to law, and they deserve great credit for having performed this onerous, and no doubt unpleasant duty in an honest, conscientious, and diligent way, and not in the perfunctory way in which it is sometimes unfortunately performed in cases of this character.

I am aware of the rule that new trials upon the ground of newly-discovered evidence are not favored by the courts.   I am also aware of the rule that the discretion of a trial judge, exercised in refusing to grant a new trial on the ground of newly-discovered evidence, will rarely be controlled.   But where the newly-discovered evidence is of a character like that involved in the present case, which not only brings to one's mind the gravest doubt as to the correctness of the verdict under review, but also raises a probability that a different result might be reached on another trial if the witness is credited by the jury, I think it is my duty, as a Justice of this court, to render a judgment having the effect

to authorize a new trial to be had, in order that the testimony of the new witness might be laid before another jury in connection with the testimony adduced at the former trial, and have it determined whether that tribunal authorized by the law to pass upon all these questions shall say that the accused, notwithstanding this evidence, is guilty beyond all reasonable doubt. Human life is involved. The execution of the sentence imposed upon the accused places every one connected with that judgment and its rendition in a position where, if a mistake is made, they are powerless to remedy it. This case is special, peculiar, and exceptional, and I think that the Supreme Court not only has authority to reverse this judgment, but it is its duty to do so. In *Matthews* v. *State,* 56 *Ga.* 469, the headnote was as follows: "The newly-discovered evidence in this case suggests such a doubt as to whether the prisoner's offense may not be voluntary manslaughter, instead of murder, that, although not fully convinced that he is entitled to a new trial under the strict rules of law, this court, in the exercise of the discretion confided to it by statute, directs a new trial, in order that the prisoner may have his case examined in the light of the evidence, by a jury, whose province it will be to look at the facts themselves, and not suffer the doubt above indicated to influence their finding, unless a like doubt shall arise in their own minds by reason of the evidence which shall come before them, nor unless it shall moreover seem to them to be a reasonable doubt." The opinion of Judge Bleckley is in the following language: "There is no error in the record, except as to the newly-discovered evidence. In respect to that, while we are not entirely convinced, we deem it best to treat the case as special and peculiar, and give it the direction indicated in the headnote. Human life being involved, we do not feel quite warranted in denying a new trial on the state of facts." In *Cooper* v. *State,* 91 *Ga.* 362, which did not involve a capital offense, a judgment refusing a new trial in a criminal case was reversed upon reasons similar to those stated in the *Matthews* case.

This court has power, in a case of this character, to prevent the taking of human life when there is a doubt as to whether that life has been forfeited under the law. With the greatest respect for the opinion of my brethren who constitute a majority of the court, and the learned and able judge who presided at the trial, I must dissent from an affirmance of this judgment, for the reason that

my mind is not at rest, under the light of the newly-discovered evidence, as to whether the accused is guilty beyond a reasonable doubt of the crime of which he was convicted. I am authorized to say that Mr. Justice Atkinson concurs in the views above presented.